**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Loren E. THOMPSON, doing business as Parkersburg Die & Tool Company,**
**Defendant.**

**Civ. A. No. 760–W.**

United States District Court
N. D. West Virginia,
at Wheeling.

Dec. 12, 1958.

Albert M. Morgan, U. S. Atty., R. J. Schleuss, Asst. U. S. Atty., Fairmont, W. Va., for plaintiff.

Robert Evans Stealey, Lawrence M. Ronning, Parkersburg, W. Va., for defendant.

BOREMAN, District Judge.

This is an action instituted by the United States of America against Loren E. Thompson, doing business as Parkersburg Die & Tool Company, of Parkersburg, West Virginia, for damages caused by the defendant's non-performance of certain contracts with the government.

Four separate contracts are in issue, one for the United States Navy and three for the Army Corps of Engineers, each of which was entered into by the defendant and the particular service agency concerned as a result of invitations for bids, the defendant being the successful bidder and being awarded each contract. Upon declaration of default and termination of each contract, the plaintiff readvertised and awarded replacement contracts for the articles involved and brought this action for the excess costs incurred by the plaintiff in obtaining the articles from other suppliers.

The suit was tried to the Court in lieu of a jury, and at the trial no evidence was introduced by the defendant in defense of Counts II, III and IV, the three Army contracts. In fact, the only issue as to these contracts raised by the defendant was an item of damage claimed by the plaintiff in Count IV as arising from a difference in certain material used by the replacement contractors.

However, as to Count I, involving the Navy contract, the several theories of defense are as follows: (1) That the defendant was not in default in the performance of the contract when the plaintiff terminated it; (2) that the plaintiff is estopped by its conduct from asserting a breach of contract on the part of the defendant; (3) that the plaintiff waived performance of the contract by the defendant according to its terms; and (4) that even if the defendant was in default, the plaintiff did not have the right to terminate the contract, under the provisions of Section 11(f) of the contract. Count I. The Navy Contract NObs 47684.

On March 8, 1949, the United States Navy Bureau of Ships awarded the defendant a contract, the subject of Count I of the complaint herein, for the manufacture and delivery by the defendant of three stern tube shaft assemblies for ships known as tenders, only two of which are involved in this litigation. This contract provided for delivery by the defendant within 190 days at a price for the two subject shaft assemblies of $11,991.30 each, or a total for the two shafts of $23,982.60.

At the time the defendant bid for and entered into the contract, he knew that he would not be able to manufacture the shaft assemblies and complete them

for delivery in his shop in Parkersburg, and that he would require the services of a subcontractor to machine and bore the shaft forgings. Notwithstanding this, the defendant did not undertake to even order this work from a subcontractor until August 12, 1949, more than five months after the date of the contract and only slightly more than one month before the finished article was to be delivered under the terms of the contract. On that date, the defendant placed his order with Barium Steel and Forge Company (now called Industrial Forge and Steel Company), of Canton, Ohio, for the necessary preliminary work. Under the subcontract, the supplier, Industrial Forge, was to purchase the required ingots and to forge, hollow bore, and rough machine the shafts in its plant at Canton, as the defendant's shop in Parkersburg was not equipped to do this work. After completion of this work by Industrial Forge, the defendant planned to finish and attach certain appurtenances to the shafts at his Parkersburg shop. However, there was no definite date set for completion of the work by Industrial. In fact, the work order by the defendant was not confirmed by Industrial until November 14, 1950.

Upon questioning by the Court, the defendant frankly stated that when he took the contract with the Bureau of Ships he knew that he would not be able to perform within the original time limits specified in the contract, but was counting on extensions, the granting of which the defendant seemed to regard as a customary practice with the government, or, at least, with the Navy.

On October 9, 1949, the defendant requested and was granted a 90-day extension of delivery date. Then on May 1, 1950, five months after the first extension had expired, the defendant requested and was granted a further extension of 120 to 150 days, or until September 30, 1950.

The plaintiff, by J. C. Marley, a contracting officer for the Bureau of Ships, by letter dated August 22, 1950, requested a detailed report on the progress being made under the contract and a stipulation of "firm and realistic" delivery dates. The defendant finally replied to this letter over a month later on September 27, 1950, in which reply he stated that he had been trying to obtain a firm delivery schedule from his subcontractor. However, he neglected to furnish any of the information requested by the plaintiff. At this time, it should be noted, the subcontractor had not yet even confirmed the defendant's order of August 12, 1949.

On October 23, 1950, over three weeks after the last extension had expired without delivery or satisfactory answer to the plaintiff's request for a progress report, the Bureau of Ships Contracting Officer, L. T. Harrison, notified the defendant by letter that he was in default on the contract, requesting a cure of this default within ten days or, in lieu thereof, a statement of the reasons, if any, as to why the contract should not be terminated for default. This default notice, or "ten-day cure letter" as it is called by the government witnesses, was sent to the defendant pursuant to Section 11 of the principal contract, the pertinent part of which reads as follows:

"Section 11. Default

"(a) Whenever the Contractor

"(1) refused or fails to make deliveries of the articles called for herein within the time specified in this contract, or

"(2) otherwise defaults in the performance of this contract or so fails to make progress in the prosecution of the work hereunder as to endanger performance of this contract in accordance with its terms and fails to cure such default or failure within a period of ten days (or such longer period as the contracting officer may allow) after receipt from the contracting officer of a notice specifying the default or failure, the Government, subject to the provisions of paragraph (a) of the Section hereof entitled 'Termination at the Option of the Gov-

ernment' and of paragraph. (f) below, may by a notice in writing to the Contractor terminate the performance of work under this contract in whole or in any part."

Although there are vague allusions in the testimony to other letters written to the plaintiff by the defendant shortly following the default notice, there is no evidence as to when they were transmitted or what they contained. However, on November 15, 1950, having the previous day received confirmation of his order from the subcontractor, Industrial, the defendant wrote the plaintiff, advising of the confirmation. In this letter the defendant represented that. the two shafts in issue should be ready for shipment by May 1, 1951. Five days later, on November 20, 1950, Industrial advised the defendant that it was having technical difficulties with its own contract with the Navy to produce some submarine shafts for the Portsmouth Navy Yard, and that these submarine shafts would have to be completed before Industrial would proceed with the work for the defendant. The defendant did not immediately inform the plaintiff of this new development.

The plaintiff's contracting officer, in ignorance of Industrial's problems and of the inevitable resultant delay in the completion of the defendant's contract, wrote the defendant on November 30, 1950, advising him that in view of the representations contained in the defendant's letter of November 15, 1950, as to expected delivery dates, no further action would be taken regarding the determination of default. This letter closes with the following sentence: "The Government reserves the right, however, to terminate contract NObs–47684, without additional preliminary notice of default in performance, in the event of future failure to make progress under the contract." The defendant urges that the final phrase of this closing sentence has the effect of granting an indefinite extension, to continue so long as the defendant continues to make any progress at all under the contract.

However, the letter must be read as a whole in construing and determining its intent. It is the opinion of the Court that the clear import of the letter is that the Government reserved the right to terminate the contract for default without an additional default notice, but that in view of the defendant's representations as to expected delivery dates it promised not to cancel the contract at that time, presumably in order to give the defendant a chance to meet the delivery date of May 1, 1951. Although the phrase in question is admittedly rather poorly worded, it is the Court's finding that under a reasonable construction this phrase refers to progress toward completion on the stipulated date of May 1, 1951.

On December 15, 1950, when the defendant visited Industrial's plant in Canton to make an investigation of the problems there, Industrial requested the defendant's personal assistance in working out certain technical difficulties which had developed in connection with performance of its own prime contract with the Navy. Then on the same or following day, the defendant notified the plaintiff of the difficulties at Industrial; and during December he had several personal interviews with Commander Rupp (Captain Rupp at the time of trial), the Bureau of Ships' technical representative, concerning the technical problems involved in Industrial's contract with the Navy.

The defendant, Thompson, strongly contends that he was led by the Navy's representatives to believe that Industrial's contract with the Navy was more important and pressing than his own and that if he would only assist in solving the problems of Industrial in connection with the submarine shafts, then the Navy would be content to let the defendant's own contract lie idle for the time being. However, the existence of such an understanding is not borne out by the evidence, but rather the overwhelming preponderance of the evidence shows that there was no such waiver of completion time, nor was the defendant

justified in assuming that there was such a waiver.

From the testimony of the plaintiff's chief witness, Captain Rupp, who was at the time in charge of the branch of the Bureau of Ships which had direct cognizance of the contract in question, it appears that the Navy considered and treated the contract with the defendant and the contract between the plaintiff and Industrial as completely separate contracts, not as being interrelated. The progressing of Industrial's contract was handled directly with Industrial, not through the defendant. Witness Rupp testified that in his recollection there was no connection at all between the contract with the defendant and the one with Industrial, and that he told the defendant that anything he did for Industrial would have no bearing on his own contract with the Bureau of Ships.

Mr. Marley, one of the Navy's contracting officers, testified that he did not recall the defendant ever having mentioned the situation at Industrial or the fact that he was working on Industrial's problems. He testified that on many occasions the defendant would drop in at his office, in a big hurry, tell him that he had talked to certain officials, that everything was all right, that he (Marley) did not have anything to worry about any more, and that the shafts were going to be delivered, and then leave the office.

Mr. Weatherly, another Navy contracting officer, testified that all of the conversations which he had with the defendant were concerning the subject of the default situation in connection with the defendant's own contract.

Mr. Fisher, a production specialist in the office of the Inspector of Naval Material in Pittsburgh, testified that he attempted several times to progress and expedite the contract, constituting a continual notice to the defendant that the Navy was at all times interested in obtaining performance of the contract. On February 3, 1951, subsequent to the time that the defendant maintains his contract was indefinitely suspended, witness Fisher inquired of the defendant by letter about the progress of his own contract. The defendant replied to this demand for a progress report on February 5, 1951. In this reply the defendant stated that his contract was not progressing at all because of his personal supervision of Industrial's contract and Industrial's inability to work on both contracts at the same time. He further stated in this letter that the officials in Washington knew all about the situation and that he had asked Marley not to charge the delay against his performance record. The defendant also stated in this letter that it would possibly be about two more weeks until work would be commenced by Industrial on the subcontract, and that he would promptly advise. The statements in this letter to the effect that the officials in Washington knew the full story are, as indicated above, simply not borne out by the preponderance of the evidence and the Court does not find any persuasive evidence to show that the defendant was justified in so assuming.

Nevertheless, the defendant continued, during the year 1951, to work on the manufacturing problems in connection with Industrial's contract with the Government, making no direct progress under his own contract. The evidence shows that he was compensated, whether adequately or not does not appear, by Industrial Forge and Steel Company for his efforts in this connection.

It does not appear that the defendant made any serious or determined effort to order the required work from another subcontractor. However, even if he had and failed, it was not the Government's fault that he was unable to find a substitute. Nor can it be said that it was the fault of the Government that Industrial Forge and Steel was thus overburdened with government contracts to manufacture shafts for the Navy. The defendant's own contract indicated that the sole place of manufacture was to be the defendant's shop in Parkersburg.

On January 14, 1952, the plaintiff terminated the contract for default under

the terms of the contract, notifying the defendant that it would readvertise for replacement bids and would hold the defendant accountable for the excess costs of obtaining the shafts from other suppliers. It is the opinion of the Court, after considering all the evidence, that the defendant was in default, had been given notice thereof, and that the plaintiff was within its rights in terminating the contract and holding the defendant liable for the excess costs.

The defendant contends that this termination for default was in violation of the terms of Section 11(f) of the contract in that he was not in default within the meaning of this section. The pertinent parts of Section 11(f) provided as follows:

> "(f) This contract shall not be terminated under the provisions of this Section and the Contractor shall not be charged with any liability to the Government if the default or failure of the Contractor is due to causes beyond the control and without the fault or negligence of the Contractor. Such causes shall include but not be restricted to * * * (2) acts of the Government of the United States or any State or political subdivision thereof, * * * or (10) delays of a subcontractor or supplier in furnishing material or supplies owing to causes beyond the control and without the fault or negligence of the Contractor unless the Contractor could reasonably have procured the materials or supplies from other sources."

Although this contention raises questions of mixed law and fact, the main questions are ones of fact, so the Court will consider and dispose of this contention here. Upon consideration of the evidence and the facts hereinbefore stated, the Court is of the opinion that the preponderance of the evidence shows that the default of the defendant was not due to causes beyond his control and without his fault or negligence. To answer the contention more particularly, the default was not, as envisaged by subsection (2) above, caused by any acts of the Government or its agents. This finding and the reasons for it have already been set out above. The default was probably due to "delays of a subcontractor", as stated in subsection (10) above, but the delays were not owing to causes completely without the fault or negligence of the defendant. As shown, much of the delay was attributable solely to the procrastination of the defendant himself. Furthermore, there is no evidence to the effect that the defendant could not reasonably have procured the work and materials from "other sources". On the other hand, there is evidence to the effect that there were several other concerns which were equipped and able to do such work but the defendant made no serious effort to obtain the work from another subcontractor. The Court therefore finds that the defendant could reasonably have obtained the work and materials from other sources. It follows, therefore, that the defendant's contention that the facts bring this case within the exception of Section 11(f) is without merit.

Thereafter, although the contract had been legally terminated, negotiations were had between the defendant and representatives of the plaintiff at which the defendant was told that the termination notice would not be rescinded, but that the shafts would be accepted by the plaintiff if they were completed and passed inspection prior to the awarding of replacement contracts. This offer by the Government was purely gratuitous and was made with the understanding that the business risk involved in attempting to take advantage of it would lie solely with the defendant.

The defendant again bid on this work following the Navy's action in seeking new bids to replace defendant's contract. On March 26, 1952, the defendant's bid, although the lowest, was disqualified as not being responsible. In view of the past performance of the defendant with regard to the contract in issue, the

Court is of the view that such disqualification was clearly warranted.

At the instance of the defendant, further negotiations were conducted on April 19, 1952, after which the plaintiff offered to reinstate the contract if the defendant would furnish a 100% performance bond. However, the defendant failed to furnish such bond.

On June 9, 1952, with the purpose of persuading, or even forcing, the Navy to accept the defendant's bid on the replacement contracts, the Small Defense Plants Administration issued a certification of the defendant's competency, *as to capacity and credit,* to perform the contract, if it were reinstated with a delivery date of one hundred to one hundred and twenty working days from the date of reinstatement. The Navy refused to be thus persuaded.

On June 17, 1952, the plaintiff awarded replacement contracts at an excess net cost of $16,007.31 for the two shafts which are the subject of Count I. The Government was indebted to the defendant on another matter in the amount of $1,681.86, which amount was credited by the plaintiff against the excess costs, leaving a net amount of $14,325.45 claimed by the plaintiff under Count I. Counts II and III.

On November 14, 1950, the United States Army Corps of Engineers, New Orleans District, awarded a contract, the subject of Count II of the complaint, to the defendant for the production of certain spare parts for dredges for the price of $3,800, delivery to be made within 120 calendar days.

On February 28, 1951, the same service agency awarded another contract, the subject of Count III, for additional spare parts to the defendant, at a price of $8,339.50, delivery to be made within 90 calendar days.

Neither of these contracts was completed within the time specified, and by letter dated August 28, 1951, the contracting officer of the plaintiff, acting in accordance wtih the standard termination clauses contained in both contracts, notified the defendant that the subject contracts were thereby terminated for default. The defendant attempted to persuade the plaintiff's contracting officer to reinstate the contracts, but to no avail.

Subsequently, the Corps of Engineers awarded replacement contracts for the spare parts required under the defendant's defaulted contracts at excess net costs of $562 and $462.58, respectively. Count IV.

On April 6, 1950, the United States Army Corps of Engineers, New York District, awarded a contract to the defendant for one dredge propeller tailshaft, at a price of $10,625, to be delivered within 120 to 150 calendar days.

Again the defendant failed to make delivery under this contract and, by letter of May 9, 1951, the contracting officer terminated the contract for default in accordance with the terms of the contract. Defendant offered to obtain a performance bond and was told that if he did obtain such a bond, reinstatement would be considered. However, the bond was never furnished and the contract was not reinstated.

Subsequently, on July 23, 1951, the Corps of Engineers awarded a replacement contract for the propeller tailshaft required under the defendant's defaulted contract at an excess net cost of $2,078.13.

The specifications of the defendant's terminated contract for the tailshaft required the tailshaft's outer sleeve to be nickel-copper alloy which, at the time of the original contract, was readily available on the market. However, due to the increased demands after the start of the Korean conflict, the desired alloy was quite difficult to obtain at the time of the awarding of the replacement contract. The Government, therefore, relaxed the specifications, substituting bronze for the nickel-copper alloy. On the basis that the alloy was preferable to bronze, that the alloy was "exceedingly difficult, if not impossible" to obtain at the time of the replacement contract.

although "available on the market" at the time of the original contract, and that the market price of the required amount of the alloy at the time of the replacement contract was $1,000 more than the market price of the required amount of bronze, the plaintiff says that it was further damaged to that extent and seeks to hold the defendant accountable for an additional one thousand dollars.

### Discussion of Applicable Law

In the determination of this case, the laws of the State of West Virginia control. In re Estate of Fox, 1948, 131 W.Va. 429, 48 S.E.2d 1, 7 A.L.R.2d 1. Each of these contracts in question provides that in case of default by the contractor and termination of the contract for the default, the contractor shall be liable to the Government for the cost of procuring the articles required from other sources in excess of the price fixed under the original contract. Therefore, the damages in this case on each contract will be the excess net cost to the plaintiff of procuring the items by way of replacement contracts. See Huminsky v. Gary National Bank, 1929, 107 W.Va. 658, 150 S.E. 9; 25 C.J.S., Damages, § 74 (1941).

The defendant's theories of defense (2) and (3) to Count I, as enumerated supra, are both premised on the doctrine of promissory estoppel, as explained by Professor Williston in 3 Williston, Contracts, § 679 (1936). Therein it is said that one type of waiver is:

"3. A promise or permission express or implied in fact, supported only by action in reliance thereon, to excuse performance in the future of a condition or to give up a defense not yet arisen, which would otherwise prevent recovery on an obligation. If waiver can be given any legal meaning narrower than the surrender of any right or defense by any means, this kind of surrender may properly be given the name. The promise is binding and the permission effective though without consideration. There is often said to be an estoppel here and the case is said to be distinguishable from waiver, but there is not a true estoppel, for there is no misrepresentation of an existing fact. It may be called a promissory estoppel."

The Restatement of Contracts, § 297, also recognizes the general existence of such a doctrine although it does not mention the words "promissory estoppel".

The defendant urges the applicability of the following statement in 2 Williston, Contracts, § 689 (1936):

"There has been a distinct tendency in courts of equity to enforce promises where something resembling a fraud would otherwise be perpetrated. Nothing could well have a more fraudulent operation than to allow one who is bound by a conditional promise to indicate by words or acts, while performance of the condition is still possible, that its non-performance will not affect his own action under the contract, and, subsequently, when in reliance on this statement, the promisee has failed to perform the condition, and the time has passed when it is possible to do so, to set up the failure as an excuse for the non-performance. It is immaterial whether the condition is express or imposed by law. Thus, where before expiration of the time originally fixed for performance the time is extended, though without consideration, performance within the extended time is sufficient; * * *."

Although the above quotation is considered to be a good statement of the law as far as it goes, it does not go far enough. Williston, in the same volume and section, goes further:

"To bring the case within the reason of the rule it is essential that the promisee could and would have performed the condition, or would not have allowed the defense

to arise, had it not been for the promisor's waiver. For if the promisee could not have entitled himself to performance of the promise, even had there been no waiver, there is no equitable reason why the promisor should not take advantage of the breach of condition or other defense. He has promised that he would not, but his promise was not only wholly gratuitous, but has not been acted on."

It is not shown, nor is it reasonable to believe from the evidence, that the defendant could or would have performed the condition if the plaintiff had not promised to defer requiring performance, even assuming that the plaintiff did so promise. The defendant bid on the contract in the first place, having no intention of performing it according to its original terms, and knowing full well that he would have to rely upon a subcontractor, then unknown, to do most of the work for him. He continually requested and received extensions of time, all the while having no assurance himself that he would ever be able to perform, since he did not receive confirmation of his order from Industrial until more than twenty months after the contract date. He did not even place the order with Industrial until more than five months after the contract date, while under the original contract the completed shafts were due within six months. It is manifest from the evidence that the subcontractor, Industrial, could not, or as least would not, perform the defendant's work before its own Navy contract was completed; and considering the propensities evidenced by the defendant and the history of this contract, there is no justifiable reason to assume that the defendant would have engaged another subcontractor to take the place of Industrial and thus perform his part of the contract on time.

██ However, the Court need not rest its decision on this reasoning because, as indicated above, the Court has found as a fact that there was no express or implied promise by the plaintiff

to suspend or waive the delivery time. The burden of proof to establish a waiver is on the party asserting or claiming the benefit of the waiver, and it is never presumed. Hoffman v. Wheeling Savings & Loan Association, 1950, 133 W. Va. 694, 57 S.E.2d 725. In the opinion of the Court, the defendant has not sustained this burden.

██ With respect to Count I, the defendant contends also that his bid on the replacement contracts was wrongfully and illegally rejected, since his bid was the lowest and since it received the Small Defense Plants Administration certification. As to this certification, the Court concurs with the decision of the Comptroller General of the United States, handed down in the case on November 17, 1952, to the effect that such certification, under the circumstances, should not be binding on the Navy. Although this certification might vouch for the defendant's competency as to capacity and credit, it did not insure or guarantee performance. The existence of ability to do a job does not necessarily import the existence of the tenacity or perserverence necessary to do the job for which one has the ability. The facts comprising the history of this contract show the failure of the defendant to perform the contract, whether through disinclination or lack of ability and perseverance. In view of this, the Court can find no fault with the Navy's refusal to accept a paper certification of the defendant's competency in the particulars mentioned. Although it is quite true that the Navy must accept such certification as conclusive, the certification goes only to the plant's competency as to capacity and credit. It does not presume to certify that the plant *will* perform, only that it *can*. Moreover, the language of the pertinent section, 714(f)(1), of the Defense Production Act of 1950, 64 Stat. 798, as amended by Public Law 96, 65 Stat. 131 (1951), 50 U.S.C.A.Appendix, § 2163a(f) (1), does not purport to require the government agency to give the certified plant the contract. Rather, it uses the word "au-

thorized", as is shown in the following reproduction of that section:

"(f)(1) In any case in which a small-business concern or group of such concerns has been certified by or under the authority of the Administration to be a competent Government contractor *with respect to capacity and credit* as to a specific Government procurement contract, the officers of the Government having procurement powers are directed to accept such certification as conclusive, and *are authorized* to let such Government procurement contract to such concern or group of concerns without requiring it to meet any other requirement *with respect to capacity and credit."* (Emphasis supplied.)

It is, therefore, the conclusion of the Court that the S.D.P.A. certification of June 9, 1952, had no legal effect on the issue here involved.

■ As to the $1,000 element of special damage claimed by the plaintiff to be due under the contract of Count IV because of the difference in metal used under the replacement contract, the Court finds as a matter of law that the evidence is not sufficient to sustain such claim. In proving damages the loss must be shown, with reasonable certainty, to have been caused by the defendant's breach of duty, and the trier of fact may not base findings of damages on conjecture or speculation. Turk v. McKinney, 1949, 132 W.Va. 460, 52 S.E.2d 388. See Oates v. Continental Ins. Co., 1952, 137 W.Va. 501, 72 S.E.2d 886. It is not shown that the substitution of bronze for nickel-copper alloy was actually a detriment to the plaintiff. The one witness who testified in connection with this contract stated that, strictly in his own opinion, he did not think the bronze was equal in wearing quality to the nickel-copper alloy, and that the service agency involved felt that it could not estimate the probable damage. Any determination by the Court of any damage, and the amount thereof,

in this connection would be purely conjectural and speculative. In *addition*, it was not shown by the testimony that the relaxation of specifications was necessary in the replacement contract. The only evidence on this point is to the effect that, although the alloy was difficult to obtain at the time of the replacement contract, it was obtainable.

■ As to the defendant's counterclaim (a) for the amount of $1,681.86, which the plaintiff admittedly owes the defendant as a result of previous dealings, the plaintiff had the right, under 18 Stat. 481 (1875), as amended, 31 U.S.C.A. § 227 (1954), to withhold payment of this amount until the claims of the plaintiff were pressed to final judgment. See Hines v. United States ex rel. Marsh, 1939, 70 App.D.C. 206, 105 F.2d 85; Richmond, F. & P. R. Co. v. McCarl, 1932, 61 App.D.C. 290, 62 F.2d 203. However, as the indebtedness to the defendant is admitted by the plaintiff, judgment for the amount due the defendant must be given on the counterclaim. See Thompson v. United States, 4 Cir., 1957, 250 F.2d 43, 44 (dictum).

In view of the Court's conclusion that the plaintiff was justified in terminating the Navy contract, it naturally follows that the defendant may recover nothing on his counterclaim (b), praying for damages equal to his loss of profits on the ground that the termination was wrongful.

Because of the intimate interrelationship of the facts and the legal conclusions, the Court has refrained from attempting to separate the two. Therefore, the foregoing shall be considered as containing the Court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

In view of the above findings of fact and conclusions of law, the Court finds the defendant liable to the plaintiff for the total of the net excess costs incurred by the plaintiff under the four replacement contracts over and above the con-

tract price of the respective original contracts, with interest thereon; disallowing, however, the additional $1,000 claimed by the plaintiff under Count IV. The amount to be recovered by the plaintiff shall be computed as follows:

1. As to Count I, the principal amount of $16,007.31, plus interest thereon at 6% per annum from January 14, 1952, to the date of the judgment.

2. As to Count II, the principal amount of $562, plus interest thereon at 6% per annum from August 28, 1951, to the date of the judgment.

3. As to Count III, the principal amount of $462.58, plus interest thereon at 6% per annum from August 28, 1951, to the date of the judgment.

4. As to Count IV, the principal amount of $2,078.13, plus interest thereon at 6% per annum from May 9, 1951, to the date of the judgment.

Judgment is hereby rendered for the sum of the above four aggregate amounts, with interest thereon at 6% per annum from the date of the judgment until such judgment shall be satisfied. The allowances of interest herein are in accordance with W.Va.Code, c. 56, art. 6, §§ 27 and 29 (Michie 1955).

In addition, the Court finds the plaintiff liable to the defendant under defendant's counterclaim (a) in the amount of $1,681.86 and judgment is hereby accordingly rendered for that amount in favor of the defendant, with interest thereon at 6% per annum from the date of judgment until the same shall be satisfied.

Although judgments on the principal claim and the counterclaim are rendered separately, the Court is of the opinion that the plaintiff may offset the amount of the judgment on the counterclaim against the amount of the judgment in favor of the plaintiff if so advised.

Counsel for the plaintiff shall prepare an appropriate order consistent herewith providing for the entry of judgments as of December 12, 1958, the date hereof.