**VENICE MAID COMPANY, INC.**

v.

**The UNITED STATES.**

No. 477–78.

United States Court of Claims.

Nov. 19, 1980.

James M. Marsh, Philadelphia, Pa., Attorney of record, for plaintiff; LaBrum & Doak, Philadelphia, Pa., of counsel.

Robert G. Giertz, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant.

Before COWEN, Senior Judge, and KASHIWA and BENNETT, Judges.

PER CURIAM:

This case comes before the court on plaintiff's request, filed March 17, 1980, for review by the court of the recommended decision of Trial Judge Robert J. Yock, filed February 20, 1980, pursuant to Rule 166(c), on the parties' cross-motions for summary judgment, having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the decision as the basis for its judgment in this case. Accordingly, it is concluded that plaintiff is not entitled to recover, defendant's cross-motion for summary judgment is granted, plaintiff's motion for summary judgment is denied and the petition is dismissed.

OPINION OF TRIAL JUDGE

ROBERT J. YOCK, Trial Judge:

This contract case involves an appeal from a decision of the Armed Services Board of Contract Appeals (hereinafter the Board).[1] That decision affirmed the con-

1. ASBCA No. 20792, 78–2 BCA ¶ 13,290. The parties stipulated that the amount of excess reprocurement cost is $15,321.42.

tracting officer's denial of plaintiff's claim to recoup an assessment of excess reprocurement costs. Plaintiff's sole claim here is that the Government failed to mitigate its damages by its failure to award the reprocurement contract to the plaintiff. On cross-motions for summary judgment, the parties seek review of the Board's decision in accordance with the standards of the Wunderlich Act, 41 U.S.C. §§ 321–22 (1976).

For the reasons outlined herein, the Board's decision is affirmed.

## Background

The pertinent facts found by the Board or otherwise justified by the administrative record are hereinafter set forth.[2]

On April 11, 1975, plaintiff was awarded a contract (DSA 13H–75–C–2048) by the Defense Personnel Support Center, Philadelphia, Pennsylvania, in the amount of $118,003.20. That contract required the manufacture and delivery of 40,800 cans of chili con carne without beans at various east and west coast delivery points on an f. o. b. destination basis. Delivery was to be accomplished by May 31, 1975. This was the first contract plaintiff had received for the item and the procurement office had not had any previous experience with the plaintiff.

The solicitation and contract contained a specification for the manufacture of the chili con carne. The specification for the beef (paragraph 3.2.1) to be used provides in part that:

> Beef shall be prepared from fresh chilled or frozen bone-in or boneless triangles, rounds, loins (flank off), ribs (plate off), square cut chucks or any combination of these cuts which shall be derived from steer, heifer or cow carcasses.

The specifications also contain quality assurance provisions, which required in pertinent part (paragraph 4.3.1.1) that:

> The bone-in or boneless primal cuts of beef shall be examined to determine com-

pliance with 3.2 as concerns foreign color, foreign material or foreign odor, and 3.2.1 as concerns condition, temperature, storage limitation, grade, when specified, and cuts of meat.

Shortly after the contract award, the Government's quality assurance representative (QAR) was shown the meat plaintiff had purchased and intended to use in performing the contract. The meat consisted of frozen chuck trimmings. The QAR informed plaintiff that the meat could not be used because the specifications called for "primal" cuts. Plaintiff's secretary, Mr. Walter Fox, thereupon advised the contracting officer that plaintiff could not perform the contract because it had misinterpreted the specifications. Mr. Fox testified that plaintiff was confused over the requirement for "primal cuts" and did not know what kind of meat cuts was meant by those words. However, it is clear from the record that primal cuts of meat are those which were specified by paragraph 3.2.1 of the specifications, i. e., triangles, rounds, loins, ribs and square chucks, and which cuts have not lost their identity by further cutting into secondary and smaller cuts and trimmings. On this point, the specifications are clear and unambiguous since paragraph 4.3.1.1 in which the words "primal cuts" appear specifically refers to paragraph 3.2.-1. Testimony further revealed that the term "primal cut" is a term commonly used and understood in the meat industry. In any event, after discussions with Government representatives and prior to the default termination, plaintiff fully understood the meat requirements for the contract.

Upon hearing of the above difficulties, Mr. S. J. Camilari, the contracting officer, requested that Mr. Fox meet with him to discuss the situation. Mr. Camilari suggested that plaintiff submit a waiver request, which he would forward to his technical advisers to see whether the meat plaintiff had procured could be used on the contract. A waiver request, however, was never sub-

---

**2.** *See Ordnance Research, Inc. v. United States,* 221 Ct.Cl. ——, ——, 609 F.2d 462, 465–66 (1979) and cases cited therein.

mitted apparently because plaintiff was convinced that such a request would be turned down by the Government's technical advisers. The record indicates that while the contracting officer would have relied heavily on the recommendation of his technical advisers on any waiver request, he did not feel bound by their recommendation and because of the "no supply" position of the Government on the product, he would have gone to the ultimate consumer activity to see if nonconforming supplies would be acceptable to it. If that activity was agreeable, the contracting officer would probably have granted the waiver. The Board also found that plaintiff was not told by the contracting officer, as alleged, that a waiver request would be denied.

On May 12, 1975, the president of plaintiff (Mr. Albert Darpino) and Mr. Fox met with the contracting officer and other Government representatives in Philadelphia. During the course of the meeting, Mr. Fox explained that plaintiff's production manager and quality control personnel had misinterpreted the specifications at the time of bid submission. Mr. Fox further stated that to reorder the meat, and some of the other ingredients (which also did not meet the specifications) in a rising cost market, would entail prohibitive additional costs. When the contracting officer stated that he had no other choice than to terminate the contract for default, Messrs. Fox and Darpino voiced agreement to such action. The contract was thereafter terminated for default on June 12, 1975.

Shortly thereafter, bids were solicited on the repurchase contract. Plaintiff was one of 30 contractors that were solicited for the reprocurement, and was one of five contractors that bid on the repurchase contract. Bids were opened on July 2, 1975. Plaintiff's bid appeared to be low on both east and west coast delivery points, although it was higher than the terminated contract price.

On July 8, 1975, the contracting officer contacted and received advice from his Government legal adviser to the effect that plaintiff's bid could not be considered unless it voluntarily lowered its bid to the unit prices contained in the defaulted contract. This advice was based on the legal theory that a defaulted contractor may properly compete on reprocurement and an award to such contractor-bidder is proper if its bid is otherwise low and not in excess of its defaulted price. *See In re R. H. Pines Corp.,* 54 Comp.Gen. 853 (1975) (decision B–182323). This information was relayed to plaintiff by the contracting officer on the same day.

On July 17, 1975, Mr. Fox called the contracting officer to request additional time for plaintiff to consider voluntarily reducing its price. The contracting officer gave Mr. Fox until 4:00 p. m. on July 18 to consider reducing plaintiff's bid but did not indicate or promise that plaintiff would receive the award if the bid were reduced. On July 18, plaintiff sent a telegram reducing its bid prices for each destination to those contained in the terminated contract and, on the same day, the contracting officer directed that a preaward survey be instituted on plaintiff. The preaward survey was requested because the contracting officer felt he had to consider the possibility of making an award to Venice Maid at that time.

As noted earlier, when bids were first opened, it appeared that plaintiff was low on all items. However, a computer printout dated July 24, 1975, which took into account transportation costs and discounts, showed that plaintiff was the low bidder only on the east coast items and that Rocking K Foods, Inc., was the low bidder on the west coast items. The contracting officer immediately took the matter up with his legal adviser who indicated that he would have to research the question to see if plaintiff could be considered for award. On July 29, 1975, after another discussion with his legal adviser, the contracting officer decided to reject plaintiff's bid. The reasons are stated in a memorandum of that date by the contracting officer, which in pertinent part states the following:

3. The Contracting Officer decided to reject Venice Maid's price reduction based on the following:

A. Venice Maid could not reduce its price on the West Coast lines because it was not the low bidder on an evaluated basis.

B. It was very questionable whether Venice Maid could reduce its price at all since this can only be done by an otherwise successful bidder. Even though Venice Maid is low on the East Coast lines the Comptroller General has ruled that award could not be made to a defaulted contractor at a higher price. The initial higher price would appear to preclude Venice Maid from being an otherwise successful bidder for any item.

C. Mr. Fox during telecon (Fox-Lydon) on 29 July 1975, indicated that his voluntary price reduction had been based on Venice Maid receiving the entire award.

D. Any offer to limit the reduction in price to the East Coast lines would be tantamount to negotiation which is prohibited under an I.F.B.

E. Finally the fact that Venice Maid's lack of tenacity and perseverance led to DSA13H–75–2048 [sic] being Terminated for Default cannot be overlooked. Venice Maid was given every opportunity to perform under the defaulted contract, but refused. Venice Maid should not now be permitted to profit by its wrong. Based on the foregoing, Venice Maid cannot be found to be a responsible bidder.

4. It is considered to be in the best interests of the Government to proceed with the awards to Rocking K Foods and Bryan Packing, especially in view of the critical supply position of the item involved.

At the Board hearing, the contracting officer reiterated his reasons for not awarding the repurchase contract to the plaintiff. First, he felt the opinion of his legal adviser precluded him from awarding the contract to plaintiff. Second, there was the "all or none" reply by plaintiff to the Government.

Third, there was the problem of responsibility. The plaintiff had not performed on the terminated contract, which placed the Government in a very critical supply position. He could not risk awarding a contract at that point in time to the plaintiff. There was no assurance, based on previous experience with the firm, that it would deliver the items as needed. His mission was to support the troops and get the food to them when needed. Therefore, the contracting officer stated he could not take the risk of awarding this reprocurement contract to the plaintiff at that time.

Thus on July 29, 1975, the contracting officer awarded two separate contracts for repurchase of the terminated quantities of chili. Bryan Packing Company was awarded basically the east coast items, and Rocking K Foods, Inc., the low bidder on the west coast items, was awarded basically the west coast items. The preaward survey report, which the contracting officer had ordered to evaluate plaintiff's bid on July 18, 1975, was issued on July 31, 1975, and was received by the contracting officer at least 2 days later. The survey report recommended an award to the plaintiff.

At the hearing, the plaintiff introduced into evidence three exhibits, which documented that subsequent contracts for the same item (chili con carne without beans) had been awarded to plaintiff by the Government.[3] Mr. Camilari, the contracting officer, who terminated plaintiff's contract for default in June 1975, was the contracting officer who awarded plaintiff the May 1976 contract. The remaining two contracts (February 1977 and September 1977) were awarded by other Government contracting officers. At the hearing, Mr. Camilari stated that plaintiff had been awarded the May 1976 contract for two reasons. First, almost a year's time had elapsed since the earlier default termination, the plaintiff was the low bidder, and he, as the contracting officer, felt that plaintiff could not and should not be excluded forever. Secondly, the Government

3. Contract DSA 13H–76–C–1060, May 26, 1976; Contract DSA 13H–77–C–0760, February 4, 1977; Contract DSA 13H–77–C–1178, September 27, 1977.

had, in the interim period, observed that plaintiff had participated in furnishing off-the-shelf commercial items to meet a fast supply need for Vietnam refugees, and its performance had been helpful and satisfactory in this regard.

On October 16, 1975, the contracting officer issued his final decision demanding that plaintiff pay the excess costs of reprocurement plus interest. The amount of excess costs has been stipulated by the parties to be $15,321.42, which sum was recovered by setoff in favor of the Government on April 19, 1979.

Plaintiff had earlier appealed to the Board the contracting officer's default termination of the contract at issue. On summary motion, the Board dismissed that appeal for lack of jurisdiction.[4] Citing to its *National Line Company, Inc.*, ASBCA No. 18739, 75–2 BCA ¶ 11,400 decision, it reasserted its view that the Board lacked jurisdiction to decide mistake-in-bid issues. Since plaintiff's appeal on the default was bottomed squarely on a mistake-in-bid theory, the Board reasoned that its decision in *National Line* controlled the result. The Board did, however, retain jurisdiction in order to allow plaintiff to present evidence on its reprocurement excess costs/mitigation of damages theory. It is from the Board's hearing on that issue that plaintiff's appeal to this court is taken. This court has heard no complaint from plaintiff in regard to the default termination matter.

The Board on June 5, 1978, rejected plaintiff's appeal from the contracting officer's excess costs assessment against the plaintiff because, in its view, the contracting officer had made a reasonable decision that was well within his discretionary authority to make. The Board stated its ultimate conclusions in the following paragraphs

In the present appeal, the facts indicate that whatever misunderstanding appellant may have had concerning the meat requirements of the specifications, its misunderstanding was cleared up before the termination for default and it had ample time to purchase the specified meat and perform the contract. The contracting officer suggested that appellant request a waiver but appellant declined to do so. Although appellant contends that a request for waiver would not have been granted, the record indicates that the contracting officer had an open mind on the question and would have given serious consideration to such a request. However, it cannot be known whether a waiver would have been granted because a request for one was never made. In any event, we cite this circumstance not for the proposition that appellant could, or would, have received relief upon a waiver request but merely to highlight appellant's refusal to extend any effort on its part to prevent its default. Appellant's default was deliberate. It chose to default on its contract rather than incur the additional costs of performing in accordance with the specifications.

Under these circumstances, the contracting officer determined that appellant did not possess the requisite responsibility to perform had it been awarded a repurchase contract for the terminated supplies. See ASPR 1–904.1 which requires an affirmative determination of responsibility before awarding a contract to a prospective contractor and places the authority to make such determinations squarely upon the contracting officer. See, also, ASPR 1–902 which provides that recent unsatisfactory performance is an example of a problem which the contracting officer must consider and resolve as to its impact on a current procurement prior to making an affirmative determination of responsibility. A pre-award survey recommendation for an award, which in this case was received after the two repurchase contracts were awarded, is nothing more than a recommendation. The ultimate decision rests in the sound discretion of the contracting officer and this Board will not question a reasonable exercise of that discretion. [78–2 BCA at 65,026.]

Thereafter, plaintiff brought the present action in this court.

---

4. *Venice Maid Company, Inc.*, ASBCA No. 20546 and 20792, 76–2 BCA ¶ 12,045.

*Discussion*

Before this court, the plaintiff contends that the Board's decision is not supported by substantial evidence in the record and is incorrect as a matter of law. Specifically, the plaintiff states the sole issue in the case to be whether or not the Government had failed to mitigate its damages by its failure to award the repurchase contract to the plaintiff. Plaintiff argues three subpoints in this connection. First, it argues that the Board approached the case on the basis that a defaulted contractor had no legal right to be considered for the reprocurement award. Second, it alleges that the Board totally ignored the Government's obligation to mitigate its damages in this case. Third, it argues that the Board refused to review the contracting officer's arbitrary and capricious exercise of his discretionary authority in not making this reprocurement award to the plaintiff.

The defendant contends that the Board's decision is supported by substantial evidence in the record and is correct as a matter of law. Specifically, the defendant asserts that the defaulted contractor does not have a legal right to the award of a reprocurement contract, but that it may be considered for award under certain circumstances. In any event, the Government recognizes that it is under a general duty to mitigate damages, and asserts that it has met that duty in this case. Also, the defendant contends that the contracting officer in this case (and the Board so found) had properly exercised his discretion in refusing to award the reprocurement contract to the plaintiff.

It is the duty of this court to determine, under the standards of the Wunderlich Act, 41 U.S.C. §§ 321–22 (1976), whether the Board's administrative findings of fact are supported by substantial evidence and its conclusions of law are correct as a matter of law.

I. *Default Contractor's Legal Right to Reprocurement Award*

■ The plaintiff has alleged that the Board approached the case on the basis that a defaulted contractor had no legal right to be considered for the reprocurement award. In support of this allegation, plaintiff pointed to the phrase contained in the second to the last paragraph of the Board's decision:

It is unfortunate in this case that the Government officials involved in the reprocurement displayed some indecision in dealing with appellant and its bids on the repurchase contracts. Undoubtedly this was caused by confusion concerning applicable law relating to the rights (or more properly, *the lack of rights*) of defaulted contractors in bidding on and receiving repurchase contracts let against their accounts. While this caused inconvenience to the appellant in this case it does not form a basis for relief here. [78–2 BCA at 65,026 (emphasis added).]

While the Board may have used an unfortunate choice of words in that one instance, one cannot read the entire decision (including the summary motion decision[5]) and agree with the plaintiff's contention in this regard. This is evidenced by what the Board *said* and *did* in this case. The Board *said* that:

As noted previously with respect to the second ground asserted by appellant, it has generally been held by this Board and the courts that the Government has no obligation to solicit or award a contract for repurchase to the defaulted contractor. *Senter Brothers, Inc., Betsy Ross Flag Co., Inc.,* and *United States v. Thompson,* all cited *supra.* But see *World-Wide Development Co., Inc.,* ASBCA Nos. 16608, 16717, 73–2 BCA par. 10,140, affirmed on reconsideration 74–1 BCA par. 10,474, where this Board refused to apply the general rule. [76–2 BCA at 57,811.]

It further stated:

On this state of the record, it would be improper to dismiss the appeal based upon any *per se* rule that a defaulted contractor need not ever be considered for award of a repurchase contract regardless of the circumstances. [76–2 BCA at 57,811.]

---

**5.** *Venice Maid Company, Inc.,* ASBCA No. 20546 and 20792, 76–2 BCA ¶ 12,045.

After stating the above, the Board *granted* a full evidentiary hearing to the plaintiff to present its evidence on the issue of whether the Government had failed to mitigate its damages by its failure to award the repurchase contract to plaintiff.

It should also be noted that the general rule enunciated by the Board in the above passages is an entirely different proposition from that rule which the plaintiff ascribes to the Board, *i. e.*, that the defaulted contractor has no rights ever to be considered for a reprocurement award.

Virtually all forums that deal with Government contract matters adhere to the general rule to the effect that defaulting contractors *may* be considered for award of the reprocurement contract. Whether they receive the award or not, however, lies within the contracting officer's discretionary authority.[6] In any event, the Government in this case did consider the plaintiff for the reprocurement award. The appropriateness of that consideration is examined hereafter.

## II. *Mitigation of Damages*

■ Plaintiff's second contention is that the Board ignored (or allowed the contracting officer to ignore) the Government's heavy obligation to mitigate damages in this matter. The plaintiff "search[ed] in vain" through the Board's opinion and the record and failed to find *any* mention of the Government's obligation to mitigate damages.

Apparently the plaintiff searched a different decision and record than this court has. In any event, the decision is rather precise on this point. In the Board's summary motion decision disposing of plaintiff's wrongful default termination claim,[7] it stated:

The record in this appeal is incomplete. Other than the bare facts outlined above and the allegations asserted by appellant,

the record is devoid of evidence on the circumstances surrounding the award of the repurchase contract and on the status of appellant's responsibility at the time of the repurchase. On this state of the record, it would be improper to dismiss the appeal based upon any *per se* rule that a defaulted contractor need not ever be considered for award of a repurchase contract regardless of the circumstances. This is especially true in a case of this type where the Government is under a heavy obligation to mitigate its damages. The second ground asserted by appellant in defense of the excess cost assessment thus requires a full evidentiary record. * * * In either case, the issue and evidence thereon will be limited solely to appellant's contention that the Government failed to mitigate its damages by its failure to award the repurchase contract to appellant. [76–2 BCA at 57,811.]

Further, the decision appealed from the Board states:

The sole contention appellant advances here as a defense to the excess cost assessment is that the Government failed to mitigate damages because appellant was improperly denied award of all or part of the repurchase contracts.

At the time of our earlier decision on the Motion to Dismiss the record before us was meager on the circumstances surrounding the award of the repurchase contract and on the status of appellant's responsibility at the time of the repurchase. In the light of this Board's decision in *World-Wide Development Co., Inc.*, ASBCA Nos. 16608, 16717, 73–2 BCA ¶ 10,140, affirmed on reconsideration 74–1 BCA ¶ 10,474, wherein we refused to apply the general rule, we advised the parties herein that it would be improper to dismiss the appeal based upon any *per se* rule that a defaulted contractor need not

---

**6.** *See, e. g., Churchill Chemical Corp. v. United States*, 221 Ct.Cl. ——, ——, 602 F.2d 358, 363 (1979); *United States v. Thompson*, 168 F.Supp. 281, 289 (N.D.W.Va.1958), *aff'd*, 268 F.2d 426 (4th Cir. 1959); *Wear Ever Shower Curtain Corp.*, GSBCA No. 4360, 76–1 BCA ¶ 11,636 (1975); *In re R. H. Pines Corp.*, 54

Comp.Gen. 853 (1975) (decision B–182323); *In re PRB Uniforms, Inc.*, 56 Comp.Gen. 976 (1977) (decision B–187723).

**7.** *Venice Maid Company, Inc.*, ASBCA No. 20546 and 20792, 76–2 BCA ¶ 12,045.

ever be considered for award of a repurchase contract regardless of the circumstances. Accordingly, we granted appellant's request for a full evidentiary hearing on this sole issue to develop the pertinent facts. [78–2 BCA at 65,025–26.]

Not only did the Board's decision(s) in this matter *say* that mitigation of damages was the sole issue to be tried, but a reading of the entire administrative record makes clear that the Board's administrative law judge did, in fact, focus entirely on that issue throughout the hearing.

This court reads the Board's decision as finding that the Government met its obligation to mitigate damages.[8] That decision is supported by substantial evidence in the record and is correct as a matter of law.

### III. Contracting Officer's Exercise of Discretionary Authority

Plaintiff's third and final contention is that the Board refused to review the contracting officer's exercise of discretion in making the reprocurement awards to firms other than the plaintiff.

After careful review of the record and the decision in this case, this court has concluded that the Board did, in fact, review the contracting officer's exercise of his discretionary authority. The Board found it had been reasonably exercised based on the facts, and that it was legally correct based on the applicable statutes, regulations and other legal precedent. This court agrees with the Board's assessment.

This court has long recognized that the contracting officer has "very wide discretion" in determining the responsibility of those bidders to be awarded contracts. *Keco Industries, Inc. v. United States*, 203 Ct.Cl. 566, 576, 492 F.2d 1200, 1205 (1974); *Tidewater Management Services, Inc. v. United States*, 216 Ct.Cl. 69, 83–84, 573 F.2d 65, 73 (1978). As the court stated in *Warren Brothers Roads Co. v. United States*, 173 Ct.Cl. 714, 720, 355 F.2d 612, 615 (1965):

> The statute and the applicable regulations confer broad discretion on the contracting officer in deciding who is a responsible bidder. * * * If the contracting officer acts in good faith and his award of the contract is reasonable under the law and regulations, his actions should be upheld.

\* \* \* \* \* \*

[A] contracting officer may conclude that the unsatisfactory performance of a contractor in the past was due solely to lack of perseverance, tenacity, or integrity—elements which are ethical in nature and unrelated to physical ability to perform.

In this case, the plaintiff had been awarded the initial contract. After award, it discovered that the meat (plus some other supplies) it had purchased to perform on the contract did not conform to the specifications. The contracting officer advised the plaintiff that it would have to procure the appropriate meat or request a waiver. If it took neither course, the Government would be forced to terminate the contract for default. Plaintiff willfully chose to take neither action. Whereupon the contracting officer, with the plaintiff's consent, terminated the contract for default. Thereafter, the contracting officer solicited firms (including the plaintiff's) on the reprocurement contract. When bids were opened, plaintiff appeared to be the low bidder again, although its reprocurement bid was above the initial contract terms. When plaintiff agreed to lower its bid to the original contract terms in order to conform to the Comptroller General's legal pronouncements, the contracting officer ordered a preaward survey on the plaintiff. Thereafter, it was determined that plaintiff was not the low bidder, at least on the west coast delivery items. Whereupon the contracting officer, after consulting with his legal adviser, awarded the contract to two firms other than plaintiff.

The question at this juncture, then, is whether the contracting officer abused his discretionary authority by awarding the contract to the other two firms. The Board

---

8. It is, of course, well settled law that the Government must mitigate its damages. *See* *Churchill Chemical Corp. v. United States*, 221 Ct.Cl. ——, ——, 602 F.2d 358, 361 (1979).

said the contracting officer had not. It pointed to the factual circumstances of the plaintiff's failure to request a waiver (or procure other meat) and its willful default, as evidencing recent unsatisfactory performance that the contracting officer rightfully had to consider. The Board, in addition, pointed to ASPR 1–904.1 (32 CFR 1–904.1), which requires an affirmative determination of responsibility before awarding a contract to a prospective contractor and places the authority to make such determinations squarely upon the contracting officer. It also pointed to ASPR 1–902 (32 CFR 1–902), which provides that recent unsatisfactory performance is an example of a problem that the contracting officer must consider and resolve as to its impact on a current procurement prior to making an affirmative determination of responsibility.

In view of the facts found in this case, the contracting officer had very good reasons to be concerned about the plaintiff's integrity, tenacity or perseverance necessary to do the job. *See United States v. Thompson,* 168 F.Supp. 281 (N.D.W.Va. 1958), *aff'd,* 268 F.2d 426 (4th Cir. 1959). Once the contracting officer finds there is a "reasonable doubt as to the reliability and dependability" of the contractor, the courts will not overturn a reasonable exercise of his discretion. *Warren Brothers Roads Co., supra,* 173 Ct.Cl. at 721, 355 F.2d at 616.

The above points, plus the Board's findings that the Government had no contract experience with the plaintiff prior to the award of the reprocurement contract and that the initial contract default had placed the Government in a critical no supply position, more than justify the finding of nonresponsibility by the contracting officer. This court has long recognized the relevance of considering the contractor's history of performance. *Zoda v. United States,* 148 Ct.Cl. 49, 57, 180 F.Supp. 419, 424 (1960). In *Zoda,* reprocurement was limited to the original bidders, with the second low original bidder excluded because of current difficulty in performing another contract. The Board was correct in affirming the contracting officer's nonresponsibility determination.

Several other reasons supporting this decision should also be discussed, even though they were not specifically mentioned by the Board as support for its decision.

First, plaintiff points out that the preaward survey ordered by the contracting officer on July 18, 1975, and received by him several days after the reprocurement award, had recommended a complete award to the plaintiff. Plaintiff argues that this fact contradicts the contracting officer's finding of nonresponsibility, and, in any case, indicates the contracting officer's intent to punish the plaintiff for its prior default.

The court does not agree. To begin with, the preaward survey was a recommendation that the contracting officer, exercising his independent judgment, could follow or not depending upon other relevant circumstances. Secondly, the preaward survey discussed the ability of plaintiff to perform, *i. e.,* physical plant, finances, technical ability, management, etc. It did not, however, speak to integrity, tenacity or perseverance, all of which the contracting officer was duty bound to consider, since the plaintiff had not satisfactorily performed on the defaulted contract.

Finally, this court finds no motive to punish involved in this factual circumstance at all. While it is quite true that the contracting officer did award the reprocurement contract prior to his receipt of the preaward survey, the factual background found by the Board adequately explain the contracting officer's actions. On July 24, 1975, when the contracting officer received the computer printout which found plaintiff's reprocurement bid not to be low on the west coast items, he immediately sought legal advice. His Government legal adviser indicated that the plaintiff was not the low bidder; consequently, he could not be considered for the award. Based on that legal advice, plus the no supply position, the contracting officer decided to go ahead even though he had not received the preaward survey. Time and events in the contracting officer's mind had overcome the need for the preaward survey. In view of the above,

**700**

this court concludes that the contracting officer acted in a reasonable and prudent business manner in going forward with the award and did not abuse his discretion. *See In re F & H Manufacturing*, Comp.Gen.Dec. B–184172 (4 May 1976), 76–1 CPD ¶ 297.

Second, plaintiff points to several subsequent contracts the Government awarded to the plaintiff for the same item (chili), as indicative of the fact that plaintiff was responsible and should have been given the reprocurement award. The contracting officer, when asked at the hearing about the May 1976 contract, indicated that he could not exclude the plaintiff forever. The plaintiff seized on this response as further proof of the contracting officer's bad motives and interest in punishing plaintiff for the earlier default.

Again, this court disagrees with the plaintiff's assertion. The contracting officer adequately explained that in the intervening year between the reprocurement contract award and the May 1976 contract award, the plaintiff had participated in furnishing off-the-shelf commercial items to meet a fast supply need of the Government for Vietnam refugees, and that plaintiff's performance in that regard had been helpful and satisfactory. This does not show bad motive, but only that time and experience moves on and is relevant to later discretionary decisions. Therefore, these late awards do not reflect on the appropriateness of the earlier nonresponsibility determination.

Finally, plaintiff argues strenuously that the contracting officer had erroneously relied on a statement allegedly made by the plaintiff's secretary, Mr. Fox, to a Government procurement officer (Mr. Lydon) to the effect that the plaintiff would only consider reducing its reprocurement bid prices if it were in line for the entire award. The contracting officer did indicate that this communication was one of several reasons why he decided to award the contract to two other firms and not consider the plaintiff for either part of the award.

The Board specifically declined to make a factual finding on this "all or none" point.

It did so because, in its judgment, its rationale for the decision was supported on other grounds (nonresponsibility) and made a decision on that point unnecessary. In view of the overwhelming evidence pointing to the correctness of the Board's decision, this court finds nothing improper in the Board's approach on this point.

In summary, the plaintiff attempted at the Board hearing to show that it should have been awarded the repurchase contract. In its view, that was the only way that the Government could properly mitigate its damages. It did not allege or attempt to show any other mitigation failures on the Government's part. Such a showing necessitates a finding that the contracting officer acted arbitrarily and capriciously in awarding the contract to firms other than itself. The Board did not so find or conclude, and therefore denied the plaintiff's claim. There is substantial evidence in the record to support the Board's factual findings and there are no errors of law. Consequently, this court determines that the Board's decision should be affirmed.

### CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and the petition is dismissed.