**HOWARD COOPER CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, H. Lawrence Garrett, III, Secretary of the Navy, Craig S. King, General Counsel to the Navy, Rear Admiral Daniel W. McKinnon, Jr., Commander, Naval Supply Systems Command, Captain James C. Cheney, Deputy Commander, Naval Supply Systems Command, and Julius Gostel, Jr., Contracting Officer, U.S. Navy Supply Depot, Subic Bay, Philippines, Defendants.**

Civ. A. No. 90–479–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

March 14, 1991.

Robert W. Tate, John B. Tieder, Jr., John J. Joyce, Watt, Tieder, Killian & Hoffar, McLean, Va., for plaintiff.

Dennis E. Szybala, Asst. U.S. Atty., Alexandria, Va., Eloisa Regalado, Deputy Counsel, Naval Supply Systems Command, Washington, D.C., for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

This is an unsuccessful offeror's challenge to the Navy's award of an auto parts supply contract to a competitor. Plaintiff, the unsuccessful offeror, charges that the award was unlawful and seeks cancellation of the award together with a declaration that the plaintiff was entitled to the contract or that the Navy must reopen the competition.

Plaintiff originally moved for a temporary restraining order and preliminary injunction. The request for a temporary restraining order was denied. Pursuant to Rule 65(a)(2), Fed.R.Civ.P., the hearing on the preliminary injunction was consolidated with the hearing on the merits. The Court has had the benefit of that hearing and extensive legal and evidentiary materials submitted by the parties. On the basis of the record as a whole, the Court concludes, for the reasons recorded here, that plaintiff is not entitled to the relief requested.

### Facts [1]

The United States Navy owns three automotive Contractor Operated Parts Stores ("COPARS") under the control of the Naval Supply Depot at Subic Bay, Republic of the Philippines. A Contractor Operated Parts Store (COPARS) is a store "located on [a] military installation for which the Government furnishes necessary space, utilities (except telephone service) and some specified administrative support equipment but which are operated by Contractor personnel and stocked with Contractor-owned inventory." RFP § H.5(a). Through a competitive proposal and negotiation process, the Navy contracts with private companies to stock and operate the COPARS. The winning company thereby becomes the primary automotive parts supplier for the Naval Station at Subic Bay and Clark Air Force Base. Prior to the contested contract award, plaintiff Howard Cooper Corporation ("Howard Cooper") op-

erated the COPARS pursuant to a contract with the Navy. In late 1989, the existing COPARS contract with Howard Cooper was due to expire, and the Navy commenced the competitive contract award process by issuing a request for proposals ("the RFP"). The RFP requested proposals from aspiring companies for supplying three kinds of automotive parts: (1) price listed rebuilt parts, (2) price listed replacement parts, and (3) price listed original equipment manufacturer parts ("OEM parts"). RFP § B.2.1. In addition, an offeror was to submit a proposed price to reflect operating the COPARS beyond normal working hours and for providing certain data required under the contract. The RFP made clear that in fulfilling the Navy's needs the selected contractor would attempt to fill an order first with suitable rebuilt parts, then with replacement parts, and finally with OEM parts only as a last resort. RFP § C.1(b). As a guide to offerors, the RFP set forth the Navy's estimates of the annual total dollar volume of each of the three parts categories likely to be purchased at the COPARS. These figures were based on past experience and the list prices of parts suppliers, although the Navy noted its expectation that offerors would offer various parts at discounts from the list prices as parts suppliers customarily gave such discounts to retailers.

Under the contract envisioned by the RFP, the contractor bound itself to supply all the Navy's needs for parts for which price lists were submitted by the offeror and accepted and incorporated into the final contract by the Navy. For its part, the government bound itself to use the winning contractor to satisfy its requirements for all parts covered by the contract. The RFP therefore contained lengthy instructions on the price lists to be submitted for replacement, rebuilt, and OEM parts. With respect to replacement parts, the RFP directed offerors to submit price lists that, at a minimum, covered thirty-two specific kinds of parts. These price lists were required to

---

**1.** This opinion constitutes the Court's findings of fact and conclusions of law in accordance with

Rule 52(a), Fed.R.Civ.P.

be "nationally recognized and in normal distribution in the trade." RFP § L.25(a); *see* RFP § K.16(a). If price lists from more than one distributor were furnished covering the same part, the Navy would be invoiced only at the lowest price less any discount offered by the contractor. *Id.* With respect to rebuilt parts, offerors were required to submit price lists that were "regionally or nationally recognized and in normal distribution in the trade" covering, at a minimum, fifteen specific parts. RFP §§ K.16(b), L.25(b). Finally, and of particular relevance to this action, the RFP required offerors to submit OEM parts price lists obtained from 114 manufacturers listed in the RFP or, alternatively, written documentation from a specific manufacturer indicating that no price list was available for that manufacturer. RFP §§ K.16(c), L.25(c) and (f).[2] The price list requirements of the RFP appear to have been mandatory; yet, the RFP gave discretion to the Navy's contracting officer to continue to entertain a proposal despite its failure to comply with the price list requirements.[3]

Also relevant to the instant dispute, the RFP set forth the method of evaluating competing proposals:

> The procedure will be to select one [replacement or rebuilt] part applicable to the [Navy's] vehicle fleet listed in Attachment I, for each category in Sections L.25(a) [i.e., the replacement parts] and L.25(b) [i.e., the rebuilt parts]. Ten applicable OEM parts ... will be selected at random. The net cost of these [replacement, rebuilt and OEM] parts will be calculated by applying offeror's discount to offeror's price list for the part(s). Net cost for each item will be added to result

in a total net cost for the sample. Award will be made to that offer which results in low net cost for the sample. RFP § M.2(b). Hence, the RFP alerted offerors that samples of the three types of parts would be evaluated on a part-by-part basis to determine the lowest cost to the Navy.

Only Howard Cooper, the incumbent CO-PARS operator, and Diamond Auto Parts ("Diamond") submitted proposals determined by the Navy's contracting officer to be responsive to the RFP. The contracting officer analyzed the proposals and determined that Diamond was the low cost supplier for each of the three categories of parts. Diamond offered a discount of 37.5% on rebuilt parts and replacement parts, and 5.0% on OEM parts. In sharp contrast, Howard Cooper offered discounts of only 25% on rebuilt and replacement parts, and *no discount* on OEM parts. The estimated savings to the Navy from selecting Diamond's proposal over Howard Cooper's on rebuilt and replacement parts alone was over $130,000 per year, while the savings on OEM parts was estimated at approximately another $100,000 per year.

The Navy contracting officer prepared and forwarded a Business Clearance Memorandum on December 21, 1989, requesting approval of an award to Diamond. This approval was granted by the Naval Supply Systems Command. On January 3, 1990, the contracting officer notified Diamond that it had been selected for award of the contract.[4] The officer then informed Howard Cooper on January 4, 1990 that it was not the successful offeror. Howard Cooper initially responded by filing a protest with GAO, alleging that Diamond lacked

---

**2.** Specifically, the RFP stated as follows:

> Offerors are required to submit price list [sic] for the Manufacturers listed in Section L.25(c). If price lists are not available, as documented by written documentation from the Manufacturers, offerors are required to indicate in their proposals and submit copies of the documentation. Price lists determined by the contracting officer to be not available to offeror will be deleted from the Solicitation prior to award of a contract.
>
> RFP § L.25(f).

**3.** *See* RFP §§ L.25(d) and (f), M.1, and discussion *infra* in Part II, Section A.

**4.** At the initial TRO hearing, the government contended that Diamond must be joined as an indispensable party to this proceeding. While Diamond may well qualify under Rule 19(a)(2), Fed.R.Civ.P., as a party that should be joined, Diamond cannot be subjected to this Court's process. After weighing the factors contained in Rule 19(b), Fed.R.Civ.P., the Court concludes that Diamond is not an indispensable party to this proceeding.

the wherewithal to finance the inventory required by the contract and lacked experience managing an auto parts COPARS. GAO dismissed the protest. This law suit followed.[5]

Howard Cooper raises no objections to Diamond's proposal with respect to replacement and rebuilt parts. The issues in this action focus on the RFP requirement to supply price lists for the 114 OEM parts manufacturers. Diamond submitted fewer price lists for the manufacturers than did Howard Cooper. The parties agree that Howard Cooper submitted price lists for 51 of the 114 manufacturers.[6] There is a dispute as to Howard Cooper's response with respect to the remaining sixty-three manufacturers.[7] The Court finds that the record, specifically the proposal submitted by Howard Cooper, shows that for the remaining sixty-three manufacturers Howard Cooper submitted current, 1989 documentation indicating that no price lists were available for twenty-eight manufacturers. For twenty-two manufacturers, Howard Cooper submitted non-current 1986 documentation indicating that these manufacturers either did not maintain price lists or would not reveal them. Howard Cooper pledged that additional current information would be submitted for these manufacturers if and when it was received. Howard Cooper further claimed that eleven manufacturers were either no longer in business or simply could not be located, and that one manufacturer refused to send either a price list or documentation.[8]

The record, specifically Diamond's proposal, reflects that Diamond submitted OEM parts price lists for thirty-five manufacturers listed in the RFP and for four additional manufacturers.[9] It submitted current, 1989 documentation for eighteen manufacturers, indicating that those manufacturers would not make price lists available. No documentation or price lists were submitted for the remaining manufacturers. In sum, Howard Cooper submitted price lists for 51 manufacturers out of the 114 listed and Diamond submitted lists for 35 plus 4 additional manufacturers. Howard Cooper presented current documentation for 28 manufacturers, Diamond for 18. And Howard Cooper also submitted non-current 1986 documentation for 22 manufacturers. Based on this, Howard Cooper raises a multitude of objections to the Diamond contract award, all hinging on the fact that Diamond submitted fewer OEM price lists than Howard Cooper.

---

**5.** Named as defendants in addition to the United States are H. Lawrence Garrett, III—the Secretary of the Navy, Craig S. King—General Counsel to the Navy, Rear Admiral Daniel W. McKinnon, Jr.—Commander, Naval Supply Systems Command, Captain James C. Cheney—Deputy Commander, Naval Supply Systems Command, and Julius Gostel, Jr.—Contracting Officer, U.S. Navy Supply Depot, Subic Bay, Philippines. Given the result reached in this opinion, it is unnecessary to consider whether each of these defendants is a proper party. All defendants are referred to collectively as "the Navy."

**6.** *See* Transcript of the Bench Trial at 6 (statement of Navy's counsel), 17–18 (statements of Navy's and Hoover's counsel); Plaintiff's Rebuttal of Defendant's Statement of Facts and Supplemental Argument at 2.

**7.** Howard Cooper contends that it submitted explanatory documentation supporting the unavailability of current price lists for 57 additional manufacturers and a letter stating that the remaining 6 manufacturers simply did not respond in any fashion to Howard Cooper's requests for price lists. Transcript of Bench Trial at 7. The Navy argues that Howard Cooper submitted documentation for only 25 of the 57 manufacturers, and that for many of the remaining manufacturers Howard Cooper submitted 1986 price lists with the explanation that it was still attempting to obtain current lists. Transcript of Bench Trial at 29.

**8.** When summed, the preceding accounts for 62 of the remaining 63 manufacturers. This slight discrepancy as to one manufacturer, which may be accounted for by several explanations, is not material to any conclusion reached by the Court. Moreover, there exist slight differences between the figures in the text, which are based on a review of the proposals, and the final figures provided by the Navy in its Statement of Facts and Supplemental Argument at 11–12. These differences also are not material to the Court's conclusions.

**9.** Thirty-five of the price lists were for OEM parts manufacturers listed in § L.25(c) of the RFP. Price lists for four additional manufacturers not identified in the RFP were offered by Diamond, pursuant to § H.19 of the RFP. The contracting officer determined to accept and incorporate these four price lists in the contract.

*Analysis*

## I. Standard of Review

■ The Navy's contract award decision is reviewable by the Court under the Administrative Procedures Act, 5 U.S.C. §§ 704 *et seq.* *See M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1291 (D.C.Cir. 1971). That Act requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706(2)(A). Thus, in a challenge to a procurement decision, a disappointed offeror

> bear[s] a heavy burden of showing either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.

*Kentron Hawaii Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973) (footnotes omitted); *accord BMY, A Div. of Harsco Corp. v. United States,* 693 F.Supp. 1232, 1238 (D.D.C.1988). This Court's "review of defendant's decision to award the contract ... is limited and ... the court should intervene in the decisional process only if the court can determine that the decisions were 'irrational or unreasonable' " or a clear and prejudicial violation of law. *Drexel Heritage Furnishings, Inc. v. United States,* 7 Cl.Ct. 134, 142 (1984), *aff'd* 809 F.2d 790 (Fed.Cir.1986), quoting *Baird Corporation v. United States,* 1 Cl.Ct. 662 (1983). "The burden of proving that the decision was irrational or unreasonable is upon the plaintiff who must establish its rights through clear and convincing evidence." *Drexel,* 7 Cl.Ct. at 142, citing *Princeton Combustion Research Laboratories, Inc. v. McCarthy,* 674 F.2d 1016 (3d Cir.1982), and *Goldammer v. Fay,* 326 F.2d 268 (10th Cir.1964).

■ Pertinent to the nature of Howard Cooper's burden of proof on is that the contract solicitation at issue here was a negotiated procurement, rather than a sealed bid.[10] Contracting officers enjoy "substantially greater discretion" when conducting negotiated procurements than when soliciting sealed bids. *Drexel,* 7 Cl.Ct. at 142–43. This broader discretion affects the showing that must be made by a party challenging a negotiated contract award. As the court in *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590 (1980) stated:

> Because of the breadth of discretion given to the contracting officer in a negotiated procurement, the burden of showing this discretion was abused, and that the action was 'arbitrary and capricious' is certainly much heavier than it would be in a case of formal advertising [i.e., sealed bidding].

*Id.* at 598.

## II. Howard Cooper's Claims

Howard Cooper contends first that Diamond's proposal was not responsive to the RFP and therefore should have been rejected. Howard Cooper further contends that, even assuming the responsiveness of Diamond's proposal, the selection of the proposal for contract award (i) effectively eliminated $525,000 worth of parts from the contract and thus represented a change in requirements which should have been communicated to all offerors, (ii) caused prejudice to Howard Cooper, and (iii) led to unbalanced proposals from which the contracting officer could not determine the low-cost offeror. Finally, Howard Cooper contends that the contracting officer failed to employ the evaluation criteria specified in the RFP and acted in bad faith. These claims are addressed *seriatim.*

---

**10.** The Armed Services Procurement Act as modified by the Competition in Contracting Act, 10 U.S.C. §§ 2301 *et seq.* (1988), provides the statutory framework for Department of Defense acquisitions. Implementing regulations are set forth in the Federal Acquisition Regulations ("FAR"), at Title 48 of the Code of Federal Regulations. There exist two basic methods of soliciting goods and services under the FAR: sealed bidding, the basic governing provisions for which appear in 48 C.F.R., Part 14, and negotiated procurement, the basic governing provisions for which appear in 48 C.F.R., Part 15.

### A. *Responsiveness of the Diamond and Howard Cooper Proposals*

 Howard Cooper's first claim is that Diamond's proposal was not responsive to the RFP, and should therefore have been rejected, while Howard Cooper's proposal satisfied the RFP. In general, the concept of responsiveness "is not applicable to negotiation [procurements], where the contracting officer is permitted to conduct oral or written discussions with offerors whose proposals vary from the RFP." *Burroughs Corp.*, 617 F.2d at 598. However, "[w]hile the concept of responsiveness is not technically applicable to negotiated procurements, even in a negotiated procurement the procuring agency does not have discretion to disregard an offeror's failure to satisfy a material RFP requirement in its proposal." *In re International Filter Manufacturing Corp.*, B–235049, June 21, 1989 (Comptroller General, unpublished opinion). Howard Cooper contends that the RFP required all offerors to submit either a price list or documentation obtained from an OEM manufacturer indicating that no price list was available, for each of the 114 OEM parts manufacturers listed in the RFP. Howard Cooper argues further that the contracting officer lacked the discretion to accept Diamond's proposal as conforming to the RFP because Diamond did not present all available price lists.

Howard Cooper's claim fails because the RFP specifically indicates that the contracting officer retains discretion to accept proposals that fail to meet the price list requirements. Sections M.1 and L.25(f) of the RFP, on which Howard Cooper relies, state:

> M.1 Only one award shall be made under this solicitation. Responsiveness shall include a determination by the Contracting Officer that the price lists submitted by the offeror meets [sic] the mandatory criteria of Section L.25.

> L.25 ... (f) Offerors are required to submit price list for [OEM] Manufacturers.... If price lists are not available, as documented by written documentation from the Manufacturers, offerors are required to indicate in their proposals and submit copies of the documentation. Price lists determined by the Contracting Officer to be not available to offeror will be deleted from the Solicitation prior to award of a contract.

To these provisions, however, must be added § L.25(d), upon which the Navy relies. It states:

> L.25 ... (d) *Failure to Furnish Price Lists.* Failure to furnish the price lists *required* by [this section] with the offer may be cause for rejection of the offer.

(Emphasis in original.) The use of the permissive "may" in § L.25(d) clearly indicates that the Contracting Official possessed discretion to accept a proposal that failed to furnish all of the numerous price lists requested in the RFP.[11] There is no ground to conclude that the contracting officer acted unreasonably in determining to accept Diamond's, as well as Howard Cooper's, proposal as responsive to the RFP.

Moreover, adopting Howard Cooper's interpretation of the RFP would lead to an impractical result. Howard Cooper contends that Diamond did not submit all "available" price lists. Yet the term "available" price lists is not defined in the RFP. Howard Cooper apparently contends that because it obtained and submitted some price lists not submitted by Diamond, Diamond failed to obtain all "available" price lists and must be barred from competing for the COPARS contract. Under this interpretation, the offeror who obtains the

---

11. *Compare Drexel Heritage Furnishings v. United States,* 7 Cl.Ct. at 147 (holding that RFP which set minimum sizes for furniture purchased by State Department which "advised that '[f]ailure to offer these minimum dimensions may be cause for rejection' ... did not state that rejection was automatic or that offerors were prohibited from offering furniture below the stated minimum sizes"); *with In re Industrial Lift Truck Co.,* B–230821, July 18, 1988 (upholding agency determination that proposal was materially defective where it did not conform with delivery schedule and RFP "stated that offers not proposing to meet the required delivery schedule would be rejected").

most price lists, even if just one more, automatically wins the contract. And this would be so even if the additional list or lists are not economically significant and even if the competing bidder offers substantially lower costs for all other items. Thus, Howard Cooper's rigid interpretation of the RFP leads to unintended, uneconomic and thus undesirable results. *Compare Drexel Heritage Furnishings, Inc.*, 7 Cl.Ct. at 150 ("[t]he court doubts very seriously if any one offeror manufactured a line that met every [commercial design] requirement of the Solicitation, and, after listening to testimony for nearly a month and reviewing the thousands of pages of documents, the court is convinced that a small exception process needed to be included in the RFP, otherwise there could have been no offerors, or perhaps just [plaintiff] without competition").[12] There is no support in the language of the RFP for Howard Cooper's rigid view. On the contrary, as noted, the RFP explicitly contradicts this interpretation by granting the contracting officer discretion to accept proposals that fail to meet all of the price list requirements. The Court therefore concludes that the contracting officer had discretion under the RFP to accept Diamond's proposal as responsive to the RFP. Nor is there any persuasive evidence that the contracting officer acted unreasonably in accepting as responsive both Diamond's proposal, which contained price lists for 35 of the 114 OEM parts manufacturers listed in the RFP, and Howard Cooper's, which contained price lists for 51 of the 114 OEM parts manufacturers.

### B. *The Selection of a Proposal Containing Fewer OEM Price Lists*

■ Howard Cooper's next contention is that by awarding the contract to Diamond

the Navy deviated from estimated requirements for OEM parts provided in § B of the RFP. Specifically, Howard Cooper has estimated, based on its prior years' experience as the incumbent contractor, that the dollar volume of the parts covered by the OEM price lists it submitted, but which Diamond failed to submit, amounted to $525,000. In § B of the RFP, the government provided its dollar volume estimates, based on prior years' experience, of the value of rebuilt, replacement, and OEM parts to be provided. Those estimates were $222,900, $852,300, and $2,004,490, respectively. Thus, Howard Cooper complains that the award to Diamond excluded approximately twenty-five percent ($525,000 worth of the estimated $2,004,490) of OEM parts that Howard Cooper expected to be covered by the contract. This deviation, Howard Cooper contends, (i) represented a change in requirements which should have been communicated to all offerors, (ii) prejudiced Howard Cooper and caused a lack of equality between offerors, and (iii) so imbalanced the proposals that it became impossible for the Navy to determine the low-cost offeror. These arguments are unpersuasive.

It is true that the Federal Acquisition Regulations ("FAR") provide that when the government "changes, relaxes, increases, or otherwise modifies its requirements," it shall inform offerors. 48 C.F.R. § 15.606(a) (1990). Furthermore, after the receipt of proposals,

> If the proposal considered to be most advantageous to the Government (as determined according to the established evaluation criteria) involves a departure from the stated requirements, the con-

---

12. Although not necessary to the result reached here, the Court notes that under Howard Cooper's strict interpretation of the RFP, even Howard Cooper's proposal is arguably nonresponsive. For approximately 22 manufacturers, Howard Cooper submitted neither price lists nor current documentation indicating that price lists were unavailable; rather, it submitted noncurrent 1986 information and pledged that current documentation would subsequently be submitted. This constitutes a departure from the RFP's requirements. Moreover, although the

record is difficult to interpret, a comparison of the Howard Cooper and Diamond proposals indicates that Diamond submitted price lists for some manufacturers for whom Howard Cooper did not submit lists. Howard Cooper concedes that Diamond submitted price lists for at least two OEM parts manufacturers for whom Howard Cooper submitted no price lists. *See* Plaintiff's Rebuttal of Defendants' Statement of Facts and Supplemental Argument at 5. Therefore, Howard Cooper, by its own rigid standard, failed to submit all "available" price lists.

tracting officer shall provide all offerors an opportunity to submit new or amended proposals on the basis of the revised requirements; *provided,* that this can be done without revealing to the other offerors the solution proposed in the original departure or any other information that is entitled to protection (see [48 C.F.R. §§] 15.407(c)(8) and 15.610(d)).

48 C.F.R. § 15.606(c) (1990). But finally, the government's failure to adhere to this rule is relevant only where such failure prejudices the unsuccessful offerors.[13] These principles are of no avail to Howard Cooper for the award to Diamond involved no departure from any material RFP requirement. The RFP does not contain an absolute requirement that offerors provide any set amount of automotive parts. Rather, it provides that offerors be prepared to meet all of the Navy's requirements for price-listed rebuilt parts, price-listed replacement parts, and the OEM parts covered by price lists incorporated in the final contract. As § L.25(d) reflects, the RFP anticipated that there might exist differences between offerors in the number of price lists submitted. That is, offerors were to obtain as many OEM parts price lists as they could from the 114 manufacturers listed in the RFP, not all of whom maintained such lists or, as it turned out, were still in business. Offerors were then to submit their best offers with respect to discounts from the lists. The RFP therefore anticipated variations in the number of

OEM parts price lists submitted, and the number that would ultimately be incorporated in the final contract. Unlike the prior COPARS contract, which covered all of the Navy's needs for parts, whether the parts were price-listed or not,[14] the RFP explicitly stated that parts not covered by price-lists would be excluded from the contract at the government's option.[15] Thus, the RFP plainly contemplated that the number of parts covered by the contract might vary depending upon the number of price lists submitted by offerors and accepted by the Navy. The dollar value estimates presented in § B.2.1 of the RFP, while giving some indication of the scope of financing and operations the contract would entail, were not themselves a material requirement of the RFP. Rather, offerors were required to submit price lists for certain rebuilt and replacement parts and for as many of the OEM manufacturers as could be obtained, and to state the discounts from the price lists that would be provided. *Compare AAA Engineering & Drafting, Inc.,* B–236034, October 31, 1989, 89–2 CPD 404 ("where the estimates [in RFP] were based on the best information reasonably available, and ... information [in the RFP] ... provided a reasonable basis for calculating a ... price, the solicitation was not deficient in this regard"). In sum, because there was no material RFP requirement for a specific number of OEM price lists, the contracting officer's

---

13. *See In re Dynalantic Corp.,* B–234053, May 3, 1989, 89–1 CPD 421, stating:

It is a fundamental principle of Federal Procurement that a contracting agency must treat offerors equally.... When any agency's needs change so that a material discrepancy is created between the RFP's ground rules and the agency's actual needs, the RFP should be amended and all eligible offerors be given an opportunity to revise their proposals accordingly, *Union Carbide Corp.,* 55 Comp.Gen. 802 (1976), 76–1 CPD 134; Where an agency's failure to adhere to a ground rule would prejudice one or more offerors, the agency may not properly ignore the rule. *Emerson Electric Co.,* B–213382, February 23, 1984, 84–1 CPD 233[;]

*see also Kentron Hawaii Ltd. v. Warner,* 480 F.2d at 1169 (D.C.Cir.1973) (holding that agency contract award will not be overturned unless "the procurement procedure involved a

clear and prejudicial violation of applicable statutes or regulations"); *In re Network Solutions, Inc.,* B–234569, May 15, 1989, 89–1 CPD 79 ("[p]rejudice is an essential element of a viable protest, and where no prejudice is shown or is otherwise evident, our Office [the Office of the Comptroller General] will not disturb an award even if some technical deficiency in the award process may arguably have occurred").

14. *See* Contract No. N00651–86–D–0032, § B.1.1., Item No. 0005 Non–Price Listed Parts (Exhibit 12 of the Administrative Record).

15. By Amendment No. 0001, § H.6 of the RFP was changed prior to the submission of proposals to state explicitly that "[t]he following parts and supplies shall not be furnished under this contract except at the option of the government ... (5) Non–Price Listed Parts[.]"

discretionary acceptance of Diamond's proposal, which included fewer than all 114 OEM price lists and fewer that the 51 submitted by Howard Cooper, was permissible and contemplated by the RFP and provided no occasion for the application of FAR § 15.606(a) and (c).

Moreover, even if Diamonds' proposal is viewed as departing from the anticipated scope of the contract, Howard Cooper has not sustained its burden of showing that it was prejudiced by the selection of a proposal containing fewer OEM price lists. First, it should be emphasized that the proposals were evaluated using a random sampling technique,[16] not on the basis of the offeror's total proposed contract price. Howard Cooper must therefore show how the selection of a proposal containing fewer OEM price lists than the number submitted by Howard Cooper prejudiced Howard Cooper in its own pricing of the OEM parts and rendered it impossible to determine the low cost offeror. Howard Cooper attempts to do this. It argues that by permitting Diamond to submit fewer lists than Howard Cooper, the Navy enabled Diamond to exclude price lists from OEM parts manufacturers that gave little or no discounts. Put another way, Howard Cooper argues that Diamond was able to offer a discount for OEM products by including only price lists from manufacturers offering favorable discounts. Howard Cooper offered no discount but argues that it would have done so had it known that the RFP permitted the "selective" submission or omission of OEM price lists. This contention fails for several reasons.

First, no evidence has been submitted to show that Diamond in fact "selectively" excluded high-priced OEM parts manufacturers from its proposal. This contention is mere speculation on Howard Cooper's part,[17] despite the fact that Howard Cooper had access to information that would have been useful to support this claim if it were true.[18] Hence, there is no evidence from which to conclude that Diamond "selectively" excluded price lists from unfavorable manufacturers. The lower number of price lists might simply reflect Diamond's lack of experience in obtaining lists. Howard Cooper has not met the heavy burden placed on an unsuccessful offeror when seeking to overturn a contract award. For this reason alone, its claim of prejudice fails.

Furthermore, Howard Cooper's argument rests on its claim that it interpreted the RFP to require an offeror to submit one "blanket discount" to cover all OEM parts. Howard Cooper contends that it would have offered a discount on OEM parts if it could have separated manufacturers offering favorable discounts from those offering low or no discounts, either through "selectively" excluding unfavorable manufacturers altogether, as it theorizes Diamond may have done, or by offering different discounts for individual OEM parts manufacturers.

Yet persuasive record evidence rebuts this claim; it shows that the RFP did not require a "blanket discount" on OEM parts and that Howard Cooper knew this. Howard Cooper's single or blanket discount RFP interpretation rests on nothing more than the fact that the RFP's § B.2.1 con-

**16.** The RFP's price evaluation section provided that the contracting officer would randomly pick 10 OEM parts and would select certain other rebuilt and replacement parts. An offeror's list price for each part would be multiplied by the offeror's discount for that part, and the net cost to the government of each part would be added, to determine the lowest cost proposal. RFP § M.2(b).

**17.** *See* Affidavit of Gary Frank, Howard Cooper's Vice President for Parts Operations, dated April 30, 1990, at ¶ 10 (stating "[w]hile Howard–Cooper has no idea exactly why Diamond selected the specific OEMs it chose to submit, the opportunity is clearly present to submit only those OEMs that offer some kind of favorable treatment to Diamond ...").

**18.** Howard Cooper had contact with each of the relevant OEM parts manufacturers here, for it submitted price lists for each of them. Presumably, it also inquired of each as to the availability of discounts, or at least could have done so once it chose to contest award of the contract to Diamond. Hence, Howard Cooper could have presented information as to what discounts each of these manufacturers offered to it, and whether the 16 OEM parts manufacturers included in its proposal, but not Diamond's, offered unfavorable discount terms.

tained only one blank space for discounts beside each of the three parts categories.[19] This is too flimsy a basis on which to support Howard Cooper's contention. Moreover, it appears that even Howard Cooper did not believe it. For the rebuilt and replacement parts categories, both Howard Cooper and Diamond submitted several discount rates for each category. Both submitted a discount rate that was applicable to the majority of the price lists for rebuilt and replacement parts, but each also noted exceptions, indicating that lower or higher discount rates applied to the price lists for certain individual suppliers.[20] Hence, Howard Cooper manifestly did not feel bound by § B.2.1 to offer only one discount rate for rebuilt and replacement parts. Nor is there any reason to conclude that Howard Cooper felt constrained by § B.2.1 to submit only one blanket OEM part discount. In short, neither the RFP's terms, nor the parties' actions, support Howard Cooper's single discount argument. Howard Cooper's decision to offer no discounts for OEM parts reflected its pricing strategy rather than the requirements of the RFP.

Moreover, even assuming *arguendo* that Howard Cooper did consider offering separate OEM parts discounts, but interpreted the RFP to require a blanket discount for OEM price lists, this contention amounts to the assertion of a latent ambiguity in the RFP that Howard Cooper independently interpreted in a manner detrimental to itself. This is a self-inflicted wound. It is well settled that Howard Cooper had a duty to bring this interpretive question to the attention of the contracting officer before the due date for initial proposals. *See In re Network Solutions, Inc.*, B–234569, May 15, 1989, 89–1 CPD 74 (holding that "to the extent that the [RFP] clause was unclear, [plaintiff] should have sought clarification from the contracting officer or filed a protest contesting the clause prior to the closing date for receipt of initial proposals"); *In re GM Industries, Inc.*, B–216297, May 23, 1985, 85–1 CPD 588 (holding same with respect to unclear clause in invitation for bids). Even if the evidence suggested, which it does not, that Howard Cooper interpreted the RFP to require a blanket OEM parts discount, that interpretation cannot be used now to challenge the contract award.

In another attempt to show prejudice, Howard Cooper alleges, without supporting evidence, that because its proposal covered more OEM parts than Diamond's, Howard Cooper had greater inventory financing expenses than did Diamond, and therefore could not offer a discount on OEM parts. This claim's underlying theory is that the more kinds of OEM parts stocked and sold by a COPARS operator, the higher its inventory expenses and the lower its profit margins. In contrast, the Navy contended during oral argument that covering more OEM parts in its proposal benefited Howard Cooper by increasing its sales and profits and by spreading any salary costs and other overhead expense over more sales. The Court concludes that Howard Cooper has not adequately demonstrated

**19.** Section B.2.1 provides in relevant part:

| Description | Government Est. at List Price | Discount from List | Net Amount |
|---|---|---|---|
| Price Listed Rebuilt Parts | $ 222,900.00 | ———— | $———— |
| Price Listed Replacement Parts | 852,300.00 | ———— | ———— |
| Price Listed OEM Parts | 2,004,490.00 | ———— | ———— |

Section L.35 states in relevant part: "Discounts to be cited by the offeror, in the space provided in Section B. should be based on and in consideration of the price list submitted with the offer."

**20.** *See* § B.2.1 of Howard Cooper's Proposal, indicating exceptions to the discount rates offered for rebuilt and replacement parts; Memorandum dated September 21, 1989, included as part of Howard Cooper's Proposal, presenting separate discount rates for six suppliers of rebuilt parts and two suppliers of replacement parts; Section B.2.1 of Diamond's Proposal; Appendix to § B of Diamond's Proposal, presenting separate discount rates for four rebuilt parts suppliers and one replacement parts supplier; Business Clearance Memorandum, dated December 21, 1989, at p. 12 (Exhibit 5 of the Administrative Record) (containing summary of these exceptions).

how the greater scope of the OEM portion of its proposal increased its costs and reduced its anticipated profits from OEM parts sales. Moreover, as noted above, nothing in the RFP prevented Howard Cooper from offering discounts for some OEM parts and no discount on OEM parts for which it had higher inventory costs or less favorable manufacturer terms. In short, Howard Cooper appears to have had an adequate opportunity, equal to Diamonds, to offer a discount for OEM parts. Howard Cooper has not demonstrated that it was unfairly prejudiced by Diamond's submission of fewer OEM parts price lists.

Finally, the record shows that the difference in quantity of OEM parts price lists between Howard Cooper's and Diamond's proposals did not prevent the contracting officer from determining the low cost proposal. With respect to rebuilt and replacement parts, about which Howard Cooper raises no objections, the Navy calculated that Diamond's proposal would save the Navy approximately $134,400 each year. With respect to OEM parts, the parties agree that both Diamond and Howard Cooper offered price lists for at least thirty common manufacturers. Diamond offered a discount for these manufacturers; Howard Cooper did not. With respect to the remaining OEM parts covered by the price lists which only Howard Cooper submitted, the Navy will be able to obtain these parts, if they are needed, because it retains power under the RFP to incorporate additional price lists in its contract with Diamond.[21] Even if the Navy is unsuccessful in negotiating discounts for these price lists, its position would be no worse than under Howard Cooper's proposal which offered no discount from these price lists. In conclusion, the difference in the number of price lists submitted did not prevent the

contracting officer from determining that for all three categories of parts, Diamond's proposal was lower in cost than Howard Cooper's.

## C. *The Contracting Officer's Evaluation*

■ Section 15.608(a) of the FAR mandates that "[a]n agency shall evaluate competitive proposals solely on the factors specified in the solicitation." 48 C.F.R. § 15.608(a) (1990). Howard Cooper claims that the contracting officer departed from the RFP's evaluation criteria for OEM parts. There is no merit to this claim. The RFP's § M.2(b) directed the contracting officer to select randomly ten OEM parts, to apply the "offeror's discount to offeror's price list for the part(s)," and then to add the net cost for each part to obtain a total cost for the sample. However, once the contracting officer found that Diamond had offered a five percent discount on all the OEM price lists it had submitted, while Howard Cooper had offered no discount for any of the OEM price lists it had submitted, the Officer concluded that conducting the random sampling procedure would be pointless:

> No comparison will be made on the OEM parts ... since both offerors will definitely have the same list price; however, Diamond Auto Parts offered a 5% discount while Howard Cooper is offering no discount.

Business Clearance Memorandum at 16. Unlike rebuilt and replacement parts, which may be offered by several suppliers, each with different price lists, OEM parts come from one source, the original manufacturer. Therefore, the Navy has maintained throughout this proceeding that the price lists submitted by Howard Cooper and Diamond for the same OEM manufacturer were necessarily identical.[22] Howard

21. Section H.19 of the RFP states in relevant part:

> It is the Government's objective that parts requirements by covered by price lists to the maximum practical extent.... If it is determined at any time during the life of this contract that additional price list coverage is required, The Contractor shall be notified in writing by the Contracting Officer of the additional coverage required. If the additional

price lists are not furnished within 15 calendar days, the Government shall have the option to secure such price lists and incorporate them in the contract as a basis of pricing replacement parts.

22. *See, e.g.,* Defendant's Statement of Facts and Supplemental Argument at 17 (stating "As presented at oral argument, the OEM price lists have only one commercially established price

Cooper has presented no evidence to the contrary. Given that the OEM manufacturer price lists submitted by each offeror were similar, and that Diamond offered a blanket five percent discount on these lists while Howard Cooper offered no discount, conducting the random sample would indeed be pointless. While the Contract Officer technically did not follow the evaluation procedure outlined in § M.2(b), this departure did not materially affect the cost evaluation and was warranted by the circumstances.

### D. Bias

■ Howard Cooper's final claim is that the record reflects the Navy's bias in favor of Diamond, and that this fact establishes that the contract award was therefore infected with bad faith.

■ To prove bad faith, a "[p]laintiff must show specific intent on the part of [Navy] officials to injure the plaintiff; for example, by predetermining the awardee or by harboring a prejudice against the plaintiff." *Arrowhead Metals, Ltd. v. United States*, 8 Cl.Ct. 703, 712 (1985). This is a heavy burden. To carry it, Howard Cooper must show bad faith by "well-nigh irrefragable proof." *Id.; see also SMS Data Products Group, Inc. v. United States*, 19 Cl.Ct. 612 (1990); *Aviation Enterprises, Inc. v. United States*, 8 Cl.Ct. 1, 16 (1985); *Institute of Modern Procedures, Inc.*, B–236964, January 23, 1990, 90–1 CPD ¶ 93.

Howard Cooper's evidence falls far short of this standard. First, there are letters to Diamond from OEM parts manufacturers, submitted with Diamond's proposal, indicating the nonavailability of price lists and dated between April and July 1989. Howard Cooper argues that because the RFP was not issued until August 21, 1989, these letters are proof that the Navy improperly advanced information to Diamond before release of the RFP. This argument is unpersuasive; there is an innocent explanation that is equally likely. The preexisting COPARS contract between the Navy and Howard Cooper listed the OEM parts manufacturers' price lists and was a matter of public knowledge and could be obtained under the Freedom of Information Act. The date Howard Cooper's option under the prior contract would expire was also publicly available. Hence, any prudent competitor, including Diamond, had legitimate sources from which to obtain the identity of the relevant OEM parts manufacturers.

Next, Howard Cooper points to the fact that Diamond received a negative preaward survey [23] from a Naval Office in Van Nuys, California. This survey had been requested by, and was overruled by, the contracting officer.[24] The contracting officer's decision to discount the survey was approved by the Navy's legal counsel and upheld by Naval Supply Systems Command. Courts have "long recognized that the contracting officer has 'very wide discretion' in determining the responsibility of those bidders to be awarded contracts." *Venice Maid Co., Inc. v. United States*, 225 Ct.Cl. 418, 431, 639 F.2d 690 (1980), citing *Keco Industries, Inc. v. United States*, 203 Ct.Cl. 566, 576, 492 F.2d 1200, 1205 (1974). The preaward survey was "a recommendation that the contracting officer, exercising his independent judgment, could follow or not, depending upon other relevant circum-

---

since there is only one original equipment manufacturer for each list").

**23.** A preaward survey is "an evaluation by a [contract administration office within an agency] of a prospective contractor's capability to perform a proposed contract." 48 C.F.R. § 9.101 (1990). The survey is performed to determine whether a proposed contractor has "adequate financial resources to perform the contract[,] ... a satisfactory performance record[,]" and other similar qualifications. 48 C.F.R. § 9.104 (1990).

**24.** The contracting officer determined that the negative survey result was based on a finding that Diamond lacked satisfactory quality assurance capability. The contracting officer concluded that "[s]ince the items to be supplied are standard commercial parts, quality assurance is largely a matter of tracking supplies.... Discussions with the contractor indicate firm plans to establish a quality control system with trained personnel.... Accordingly, since all other responsibility factors are deemed satisfactory a determination of responsibility is made." Determination of Responsibility, dated December 21, 1989 (Exhibit 6 of the Administrative Record).

**842**

stances." *Venice Maid,* 225 Ct.Cl. at 434, 639 F.2d 690. Given the circumstances of this case, the contracting officer's decision not to follow the preaward survey is not evidence of bias.

### *Conclusion*

Howard Cooper has not carried the heavy burden placed on a disappointed offeror attempting to upset a contract award. Record evidence does not support Howard Cooper's claims that the contracting officer acted unreasonably or departed from the terms of the RFP or applicable regulations and laws in an unfairly prejudicial manner. On the contrary, the record suggests that an incumbent contractor was surprised, not by the Navy's interpretation of the RFP, but by the more aggressive pricing strategies of a new competitor. Howard Cooper's request for declaratory and injunctive relief must therefore be denied. An appropriate Order has entered.